J. H. WILSON and wife v. C. J. LINEBERGER.

*Executors and Administrators—Guardians—Interest—Commissions.*

1. An administrator is responsible for a debt due the intestate's estate, where it appears that the debtor occupied intimate family relations with him, and was engaged in business for some time, during which no steps were taken to collect the same and no excuse given for the neglect.

2. An administrator is not chargeable with interest, where the proof is that he has not used the assets for his personal benefit, nor unnecessarily detained the same in his hands, and has kept an account of his receipts and disbursements.

3. A guardian's primary duty is to invest the trust fund, and he will be chargeable with interest in the absence of proof that it remained in his hand unemployed without his fault.

4. Commissions allowed by a referee will not be reduced unless they are manifestly excessive. No extra charge for *personal* services of the trustee, over the *actual* expenses incurred in the proper management of the fund, will be allowed.

(*Knight* v. *Killebrew*, 86 N. C., 400; *Green* v. *Barbee*, 84 N. C., 69; *McNeill* v. *Hodges*, 83 N. C., 504; *Perkins* v. *Miller, Ib.*, 543; *Finch* v. *Ragland*, 2 Dev. Eq., 137; *Morris* v. *Morris*, 1 Jones Eq., 326; *Grant* v. *Pride*, 1 Dev. Eq., 269, cited, distinguished and approved).

CIVIL ACTION tried upon exceptions to a referee's report, at Spring Term, 1881, of GASTON Superior Court, before *Eure, J.* Both parties appealed from the ruling of the judge.

*Messrs. Wilson & Son,* for plaintiffs.
*Messrs. Jones & Johnston* and *N. Dumont,* for defendant.

PLAINTIFFS' APPEAL:

SMITH, C. J.   The partnership firm of L. Lineberger &
Co., constituted of Lewis Lineberger, J. Laban Lineberger, C.
J. Lineberger and Moses H. Rhine, owned and conducted a mill
for the manufacture of cotton goods, and in connection with the
business, a grist and saw-mill, a blacksmith's shop, and a store
for the sale of goods, situated in the county of Gaston.   The intes-
tate, Laban, was the general business agent in the purchase of
supplies, the sale of goods, and the collection and disbursement
of moneys received until June, 1869, when he became incompe-
tent by reason of mental impairment, and this general oversight
and management devolved upon the defendant, in addition to
his previous duty of keeping the books and making entries of
the transactions of the concern.

In November following, on an inquisition finding the lunacy,
the defendant was appointed guardian to the estate of the said
Laban, his brother; and upon the death of the latter on Jan-
uary, 14th, 1871, himself and the plaintiff, his surviving widow,
since intermarried with the plaintiff, J. H. Wilson, were
appointed associate administrator and administratrix of his estate.
The administration was, however, conducted and concluded by
the defendant, and as necessary thereto, the partnership accounts
and business were also left in his hands for adjustment and set-
tlement among the members thereof.

On August 24th, 1874, an arrangement was entered into, the
particulars whereof are set out in the contract copied and annexed
as an exhibit to the complaint, and the enforcement of the terms
of which is the object of the present action, for the rendering
the administration account by the defendant before the probate
judge, and the payment and delivery over to the administratrix

53

on conditions therein stated, the resultant proceeds of the trust estate in his hands.

The defendant had already, on April 5th, 1871, rendered and filed his account as guardian; and, five days after the making the said agreement, exhibited and filed his account, as administrator, as he did also, on October 23d thereafter, that of his management and settlement of the business of the copartnership—these accounts being verified and with proper vouchers passed on by the probate judge. These, the defendant relies on as furnishing *prima facie* evidence of a correct and legal adjustment of the several trusts, and the resulting balance due on the administration of each.

The jury having found for the plaintiffs upon the single issue of fact submitted, as shown in the record, at spring term, 1877, on their motion, a reference was directed to George F. Bason for a re-statement of the several accounts upon the examination of the defendant, and such other testimony as either party might adduce pertinent to the inquiries ordered, and for a report to the ensuing term.

In pursuance of the order and after continuances, rendered necessary by the comprehensive scope of the duty to be performed, the referee made his report at fall term, 1878, and numerous exceptions were put in by both parties, from the adverse rulings on which by the court, each appeals, devolving upon this court the necessity of passing upon and determining their sufficiency.

The voluminous testimony and numerous exhibits contained in manuscript referred to, but not pointed out in the defendant's many exceptions, though it was otherwise with those of the plaintiffs, imposed on the court such increased and needless labor in searching for the evidence bearing upon them and making the investigation satisfactory, that it was found indispensable to have the record printed, and this was suggested to the respective counsel.

The defendant refusing to assent to a proposition for the printing of the record for the convenience of both in passing upon the separate appeals, the plaintiffs' counsel proposed to print, and did print, for our use, the record in their own appeal, thus enabling us to examine the exceptions *seriatim,* and dispose of the entire cause.

It may become necessary, in consequence of the accumulating business of the court, and the careless practice prevailing in making up transcripts, of sending up matters in no wise bearing upon or elucidating the points presented, to require, as we believe is the general rule in courts of last resort in our sister states, the printing of the record in full, or at least the material facts of them, as indispensable to the proper and efficient discharge of the duties of our appellate and revisory jurisdiction.

We proceed to consider first, exceptions presented in the record of the plaintiffs' appeal in the order of their enumeration:

1. The plaintiffs object to the sufficiency in kind and degree of the proof offered to sustain the credit of $4,700.55, dated March 13th, 1871, allowed by the referee and upheld by the court in the partnership account, denominated and known, in the report of the referee, as the "commissioner's account." The defendant produced the voucher for this credit, to-wit: a note, the body of which is in his own handwriting, bearing the signature of the firm, L. Lineberger & Co., put there by A. P. Rhine and since torn off, and his own name written across its face.

When the note was executed, A. P. Rhine, who shortly thereafter succeeded to the rights and interests of his father, Moses Rhine, by purchasing his share in the firm, was, as agent, attending to the joint business; and the obliteration was made about the time when, as the defendant says, he had a settlement with the firm through the agency of the said A. P. Rhine. The testimony to this effect is furnished by the examination of the defendant, and there being no opposing evidence, the charge was properly allowed.

2 and 3. The next two exceptions to item No. 12, a credit of $1,268.35, and to item No. 13, a credit of $126.83, in the same account, rest substantially upon the same basis, a deficiency in the evidence in their support. These two notes were not produced before the referee, and the testimony in relation to them was in effect as follows : The defendant states that both were signed in the name of the firm by the intestate, Laban, when a member and managing its affairs; that the larger note was money put by defendant in the business, most of it in gold, which his father had given him, and the residue of the consideration of the debt was not now remembered; that both notes were filed with the clerk, as vouchers for the account rendered in his office; that the office had since been burned, and upon his application he could not obtain them.

W. C. Mason states that he applied for the vouchers for defendant at the office, and was given some of them, not including the two specified; that the papers were badly mixed up since the fire, and had not then been sorted and restored to their proper places; and that he was told by the clerk that some of his official papers had been destroyed; and if others than those then delivered should be afterwards found, they would be sent or given to the defendant.

E. H. Withers, the clerk, testified that he examined the guardian account returned to his office and the vouchers, and audited it, and that it corresponded with that produced and shown him upon his examination; that the administration account was in like manner examined and audited, and the charges sustained by proper vouchers; that the office was burned on December 12th, 1874. He further states his recollection to be, that the vouchers in the administration and commission accounts were not left with him, but carried away by the defendant; that those accompanying the guardian account were in his possession for a time; that the defendant's attorney advised him to keep these as well as the others, and defendant said he would remove them at a future time; that he does not remember that the defendant ever did

take away the guardianship vouchers; and that after the fire, witness searched for but could find none of them.

This witness had been previously examined, and his testimony, taken down in writing, had, in some unexplained way, disappeared; and while he denied that he then made any different statement from that of his present testimony, he admitted that he may have delivered to Mason some of the papers connected with the administration and commissioner's accounts, but he did not think he had done so.

He was further asked if he had not before sworn that some of these vouchers had been retained by him, and replied that he did not so testify.

The witness was closely questioned about his absent deposition and whether he had not withdrawn it, to all of which he gave a denial.

Mason swears that the deposition did contain an admission that some of the vouchers were left with the clerk.

This cursory review of the evidence satisfies us, as it did the court below, that the notes were not withheld by the defendant, and their existence being fully established, their absence is accounted for and the finding of the judge warranted.

4. The plaintiffs insist that the evidence fails to sustain item No. 17 in same account, a credit of $375.70.

The defendant says this note was subscribed by E. Pasour—the name torn off; when paid, he did not know; his recollection as to the consideration of the note, which is payable to the senior partner, Lewis, is, that it was for labor performed at the factory in 1870. The evidence supports the charge.

5. The fifth exception is withdrawn.

6. The plaintiffs insist, as erroneous, the omission to charge the defendant with the proceeds of sale of the land made by him as commissioner, and by deed of September, 1874, conveyed to Jenkins, to-wit, $1,200.

The sale was, upon the defendant's testimony, made before the dissolution of the firm, and as he thinks the proceeds passed over

to it.   In exhibit "H," balance sheet of Lineberger & Co., the amount of sales of land is entered at $18,447, in which aggregate the objectionable item is supposed to be included, and this conclusion, we think, fairly warranted by the evidence.

7. The plaintiffs complain of the failure to charge the defendant with the note of J. T. Suggs ($220) and negligence in not collecting it.   This exception must be sustained.   The debtor married the defendant's daughter—was engaged in business for a period of three years and until about four years before the date of the defendant's examination, during which it does not appear that any steps were taken to coerce payment, nor is any reason suggested for the neglect and delay.   The debt is enumerated in the class denominated doubtful, and was at the sale bought by A. P. Rhine.   The defendant, under the circumstances, must be held responsible for the loss.

We pass to the consideration of the exception to the guardian account.

8. The plaintiffs insist that the credit of $1,035.67, payment alleged to have been made on a note to L. Lineberger & Co., is improper in the absence of the note and without sufficient evidence of the indebtedness represented.   The defendant's explanation is that the note embodies the item of $947.68 found in the ledger of the firm in 1869, with interest and some other small unspecified sums.   In the referees's report the credit is entered as of January 1st, 1870, and in this discrepancy of date, it is left uncertain whether the payment was made before or after the assumption of the guardianship by the defendant in November preceding.   The matter upon the evidence is left in a very unsatisfactory condition.   But inasmuch as the credit is found in the account submitted with the vouchers to the probate court and accepted, and has been passed on and allowed by both the referee and reviewing judge, we do not feel disposed to disturb a ruling, based as it would seem to be, upon the supposed recog-

nition of its correctness by the intestate himself, who previous to lunacy had access to the books of his firm and is presumed to have seen the entry.

There is a class of exceptions sustained by the court and to be revised upon the defendant's appeal, not out of place to be considered and decided in this, to which we will now direct attention:

1. The plaintiffs insist that the defendant should be charged in his administration account with the sum of $2,876.75 and interest, due the intestate from the firm and credited to the defendant in the commissioner's account (item 10), as the adjustment must have been effected by entries in the accounts, and the transfer of the amount as a debit in one to a credit in the other.

The attention of the defendant during his examination was called to a credit entered on the partnership books as of December, 1869, to the intestate, of $3,346.68, and he was asked if he had been charged with that sum in either the guardian or administration account? In his answer, he states that it has been brought into the guardian account, intending, as understood, to say that it is included in the larger sum of $3,653.20, with which he is there charged. He states that this last credit was for notes and interest which passed into his hands when he became guardian—for services due the intestate—commissions on sale of land, and personalty, and commissions, $1,000; shown in exhibit "X."

In answer to a further inquiry, if the notes thus received did not enter into the sum mentioned in the exception and allowed as a disbursement in the partnership account, he said he did not think it was, and that according to his recollection, it was money paid him as administrator by the firm.

Upon this testimony, and without exculpatory explanation, the inference seems unavoidable that the referee has omitted to give the intestate's estate the benefit of the indebtedness due from the firm and extinguished in the partnership account, by charging the defendant therewith. But as the defendant is

charged with $259.55 as of the same date in his administration account, deemed to be part of the omitted sum, the latter should be reduced by that amount and the defendant charged with the difference, to-wit, the sum of $2,617.20, and interest from March 31st, 1871. This is the ruling of the court, and it is affirmed.

2. It is claimed that the defendant is chargeable with two notes, each of $1,465, payable in specie and executed in November, 1866.

The decision of this exception requires an examination of the evidence produced before the referee and bearing upon the point.

The *feme* plaintiff, E. C. Wilson, in substance, testifies that she delivered to the defendant, on his appointment as guardian to her husband, two notes, each in that sum, the one payable in gold, the other in specie, dated in November, 1866, with other claims, at the factory; that soon after his marriage to the intestate in December, 1867, he gave her the notes for safe-keeping, and they remained in her possession until she handed them over to the defendant. On being shown the two notes attached to voucher 3 of same principal, and bearing date January 1st, 1860, she states that she never saw any of that date from Lineberger & Co. to her husband; that the notes retained by her were in the handwriting of the deceased, the signature in that of the defendant, and were drawn payable one day after date; that there was also a gold note of $1,000, given in the same manner, among the intestate's effects in her keeping, which was, under defendant's advice, destroyed; that she had applied unsuccessfully to defendant, since, for copies of the notes surrendered to him, but had never demanded the return of the papers or any account of them.

The defendant charges himself with the amount of the two notes exhibited to the preceding witness, the principal of each being $1,465, but which Lewis Lineberger testifies in describing them as being one for that sum, and the other for $1,455, ten dollars less. This witness, if his testimony is to be received over the objection founded on section 343 of the Code, explains that

a dividend of the assets of the firm was agreed upon, paying
$1,000 to each member on account of cotton on hand, and this
$1,000 note was given to the intestate for his share.   But the
firm afterwards agreed to annul the distribution and cancel the
notes representing the shares of each, and all were surrendered
and cancelled, except that retained by the intestate and found
among his effects after his lunacy.   The intestate was then the
managing partner, and most urgently pressed the surrender and
cancellation as a disposition of the matter.   He reiterates the
practice to adjust annually the accounts of the several members
with the partnership, and the giving a firm note by one of the
others for what was found due each.   Each successive settlement
included in the ascertained result the precedent indebtedness,
represented in the partnership note, which was thus extinguished
in the new note.   In these settlements, the intestate's services
were estimated and included.   The witness states that the notes
attached to the voucher were executed at the specified date, the
one for labor rendered by the intestate during and after the close
of the civil war, the other in renewal of an old debt, and that
there had been successive annual renewals previous to January,
1869, and the intestate required it to be specie, because it was
contracted before the war, and that these were the only debts due
to the intestate by the firm.

This testimony disposes of the controversy if it is admissible
and accepted as true, and the witness being no party to the suit
nor having now or heretofore any interest to be affected by the
result of the action, his evidence is not obnoxious to the direc-
tions of the provisions of the Code, since, if there were found
such notes in existence, the antecedent were merged in the two
last, and this is a more reasonable solution of the difficulty.
The defendant's statement is in effect the same.

It would not be just to charge the defendant with the notes
described by the *feme* plaintiff, and again with similar amounts
supported by his testimony alone.   If he is to be charged thus,
his testimony in exoneration should also be heard, and this rule

54

is recognized in the Code itself. We had occasion to refer to it in the case of *Knight* v. *Killebrew*, 86 N. C., 400. In either aspect of the case, the defendant should only once be charged with the two notes, and the difference between those he admits and those described by the *feme* plaintiff, consists solely in the larger interest borne by the latter. We, therefore, hold that the defendant is not liable for the double amount.

3. The plaintiffs complain of the commissions as being excessive in amount. We have looked over the account, and think the objection not well founded.

The compensation for adjusting and settling copartnership matters, the receipts and disbursements each being in the aggregate over $100,000, is as follows:

Two per cent. on receipts proper, $109,281.15...$2,185.62
And on proper disbursements, 31,524.07... 788.10

$2,973.72

On guardian account:
Receipts, 5 per cent. on $6,131.52............ $306.56
Disbursements, $2\frac{1}{2}$ per cent. on $2,294.65........ 57.36

$363.92

On administration account:
Receipts, 5 per cent. on $4,307.94.......... $215.40
Disbursements, $2\frac{1}{2}$ per cent. on $7,382.89...... 184.57

$399.97

Making a total received for services............$3,737.61

We do not consider this sum disproportionate to the labor employed in managing and conducting these trusts to a final adjustment, and unless manifestly excessive, it is unusual to reverse the action of the referee and its confirmation in fixing upon the allowance. *Green* v. *Barbee*, 84 N. C., 69, and cases therein referred to.

4. The objection to the manner of stating the accounts is without force. Those of the partnership and guardianship precede the administration, and ascertain what sums accrue from the two former to the intestate's estate, and they are accordingly entered upon the latter.

5. The rate of interest upon all the items is properly computed at 6 per cent. The higher rate stipulated in the contract is contingent upon the results of a full settlement, which the present action contemplates, and not upon the separate items which enter into it; and it is a sufficient answer to the claim that the law did not authorize, when the contract was made, a conventional higher rate of interest except when founded upon the consideration of a loan of money, and the fact is so stated in the contract itself. Bat. Rev., ch. 114.

The accounts must be reformed in conformity with this opinion, and neither party will recover costs in the appeal.

Error.                                              Modified.

----

### DEFENDANT'S APPEAL:

SMITH, C. J. The exceptions taken by the defendant to the report of the referee and brought up for revision in his appeal, are numerous and complicated in the record. So far as they relate to the series of facts deduced from the evidence, it is needless to consider them in detail, inasmuch as they form the foundation of the referee's conclusions of law, and are to be considered and passed upon in deciding upon their correctness.

The only exception to the findings of fact proper, to be separately noticed, is that relating to the stock which the partnership held in the First National Bank of Charlotte, which on April 2d, 1873, was transferred to H. G. Springs at the price of $105 per share, making the premium paid on the fifty shares $250.

The testimony of the defendant is that the stock was assigned

to him by the firm and taken in part payment of its indebtedness to him, and that he subsequently sold it to his co-partner, Lewis, by whom it was afterwards assigned to Springs. The defendant alone seems to have settled the partnership business after its dissolution, and had this, with the other assets as they were collected, in his hands for this purpose. How and by whom the alleged sale to him was made is not shown, nor the authority from the other members by which it was attempted. If it was merely his own appropriation of the shares at their par value when they were worth much more, and were yielding large semi-annual dividends, as proved by the cashier of the bank, it could have no legal effect in passing the property to the injury of the other equally interested members, and especially of the *feme* plaintiff. The property in the shares did not pass wholly out of the firm until sold and transferred to Springs, and the two dividends paid to the partner, Lewis, properly constitute part of the effects of the firm, for which the defendant, as the sole manager, ought to be and is held responsible in this action, as well as for the full value of the stock itself.

We pass, therefore, to the consideration of those exceptions that involve questions of legal liability, and first those taken to the commissioner's account as reported.

*Exc.* 9. The defendant objects to being charged with interest on the proceeds of sale of real and personal estate, the cash on hand, and other moneys received from the date of such receiving.

This exception is sustained by the court so far as the interest is computed on both receipts and expenditures in the copartnership account, prior to June 1st, 1873, and directs the interest on all antecedent items to be computed from that day. This ruling is made on the ground that deducting the sales of the land, which were held for and have been distributed among the members of the firm, the difference between the other moneys collected and paid out is inconsiderable, showing no unnecessary detention in the defendant's hands, and negativing the presumption that he has used them for his personal advantage, or made interest or

profit therefrom. Of the sum divided among the partners, the defendant is credited with $4,270.72, the share paid over to the *feme* plaintiff, bearing date 13th day of March, 1872.

Upon this explanatory showing of the account itself, it would be obviously a harsh rule to enforce against the defendant, and make him liable for the excess of interest on the moneys received over the moneys expended, as the former must in time precede the latter. The case does not fall within the rule laid down in *Finch* v. *Ragland*, 2 Dev. Eq., 137, and affirmed in *McNeill* v. *Hodges*, 83 N. C., 504, and *Pickens* v. *Miller*, *Ib:*, 543, since the defendant kept his account, showing the sums collected and paid out, and the dates of each, and therefrom it is seen that no large sums remained in his hands unemployed for a considerable time, and which were applicable to the payment of debts. We therefore concur in this ruling of the court.

*Exc.* 10. For reasons already given, the defendant is rightfully charged with the true value of the shares of bank stock and the dividends derived therefrom.

*Exc.* 11. The exception to so much of the action of the referee and the concurrent ruling of the court, as makes the defendant liable for the debt due by W. J. Sloan in account, must be sustained, and for these reasons :

*First.* When the claim was presented by A. P. Rhine, the defendant's agent, Sloan denied his liability, asserting that the debt originated in a confederate transaction, though it bears date in the account as if contracted or due in 1867, and that besides, he had counter demands sufficient to meet the claim. This response was objected to by the plaintiffs, and the objection is valid if the declaration was called out to prove the fact asserted ; but it was competent to show the demand and refusal to pay it, and the reasons assigned for the refusal.

*Second.* The defendant swears, and there is no contradictory evidence on the point, that the intestate had charge of the collections for the firm up to the time when mental infirmity supervened, a period of some two years, when, if capable of collection

it should have been collected, and the delinquency, if it exists, is common to both. But as this is not to be presumed, it is most reasonable to infer the inability of either to enforce the payment.

*Third.* The defendant, in his testimony, says that such was the condition of the debtor from 1867 up to his going into bankruptcy, that nothing could be made out of him; that the debt was a confederate debt and the debtor had offsets of equal amount.

*Fourth.* The debtor did subsequently, at which time does not appear, go into bankruptcy.

The force of these facts is not overborne by the debtor's reputation for solvency testified to by the plaintiff, Wilson, doubtful to say the least, and the production of the record of judgments recovered to his use. The bankruptcy remains as an established fact, and it supposes a previous insolvent condition of the debtor. Under these circumstances, the defendant, in our opinion, ought not to be held responsible for the loss.

*Exc.* 12. The proofs before us do not show an allowance for the selling the real and personal estate by any competent authority, so as to reduce the aggregate of the sales, or warrant a credit to the amount of the alleged allowance of $447. But this can scarcely be detrimental to the defendant, since the referee gives him commissions on the whole receipts, inclusive of the moneys derived from the sales, and if the allowance claimed were deducted, it would diminish the commissions by perhaps an equal or even greater amount. The exception is untenable.

*Exc.* 13. The interest is charged on the aggregate sales under a previous ruling, only from a date previous to which the entire sum had been distributed among the partners. The results of a withdrawal from a gross sum of the compensation for services in relation to the fund, are precisely the same as if interest were computed upon such gross sum to any given date, and then the same per centum of compensation be deducted from the whole amount of principal and interest.

*Exc.* 14. The defendant objects that he is charged with the

indebtedness of Leander Smith in the sum of $136.22. The objection is without force, as a brief reference to the facts will show.

*First.* The defendant is credited (voucher 33) with the payment of $55.25, a debt due to him by the firm, while it appears that Smith at the same time owed the firm $136.22, which ought to have been applied to its extinguishment. No reason is suggested why this was not done. These debts are entirely outside the sum paid to Smith under the award of arbitrators, and which, as the defendant explains, could not be discharged out of Smith's indebtedness to the firm.

*Second.* The defendant, in his examination, says this debt "is good as far as I know." If so, it ought to have been collected and accounted for.

### EXCEPTION TO THE GUARDIAN ACCOUNT:

1. For that the defendant ought not to be charged with interest on the moneys received from the date of their reception.

The guardian's primary duty is to invest and take care of the funds, keeping them at interest. We discover no ground to support the exception, in the absence of any evidence or suggestion that the funds, or any part of them, remained in the defendant's hands unemployed, and without his fault. He does not testify that such was the case, and he must therefore assume the obligation of personal responsibility for interest, which, if he did not make, he ought to have made some effort to obtain.

### EXCEPTIONS TO THE ADMINISTRATION ACCOUNT.

*Exc.* 1. This exception is in relation to the charge of interest, and must be overruled. The subject matter of it has been already considered.

*Exc.* 2. For that the referee has charged the defendant, as administrator, with $1,479.45, the amount of the note of A. B.

Davidson, instead of the sum necessary to re-imburse the estate for the amount paid in compromising the suit brought against defendant, as guardian, upon the gold deposit converted into the loan represented in the note. The transaction out of which this claim arises, is thus explained by the defendant in answer to an inquiry in regard to a payment to Sarah Beatty, executrix, of $1,100, voucher 52, in his own commissioner's account:

One Samuel Beatty came to the factory and said he had left $1,000 in gold in the safe for safe-keeping. Defendant opened the safe, found a package which Beatty recognized as his own, in which was a note signed by John S. Davidson for $1,000, payable to the firm. This, defendant proposed to surrender, but Beatty refused to take it, declaring that he would hold the firm responsible. Some time afterwards, defendant, as guardian, was sued for the deposit. Pending the suit and after several efforts, an agent of the firm induced one Brevard Davidson to take up his son's note, the son having become insolvent, and execute his own to L. Lineberger & Co., for the full amount of the other.

At the ensuing term of the court an agent of the firm effected a compromise with the plaintiff's (Beatty) agent, in which the firm paid $1,000 in gold. Afterwards, the entire amount of Brevard's substituted obligation was paid to the firm.

The substance of the contention is whether the excess of the sum collected of Brevard Davidson over that paid out in the compromise, should be credited to the partnership or to the intestate.

It must be assumed, as the intestate had charge of the business, and from the evidence, that he received and loaned out the gold, undertaking therein to act for the firm and not for himself personally as distinct from the firm. The firm, through its agent, defended the action, secured the debt by taking a new obligation in the name of the firm, and compromised and paid in gold the full amount of the deposit. As the intestate's estate never paid any part of the sum claimed, and was wholly exon-

erated by the active efforts of the firm, it would seem to be just that the partnership should have the fruit of its labors and as a compensation therefor.

We think, therefore, this item properly belongs as a credit in the commissioner's account, and should be eliminated from that of the administration. To this extent the exception is sustained.

*Exc.* 3. This exception to the charge of interest, on the balance due on the guardian and transferred to the administration account, from the date thereof, has been decided in principle in passing upon preceding exceptions.

*Exc.* 4. The credit must necessarily be the resultant balance ascertained only by an admixture of principal and interest, which are inseparably united in the one sum. There is no error in this.

*Exc.* 5. The claims embraced in vouchers 92, 98, 99, 101, 103, 110, 112, 114, 116, 119 and from 121 to 128 inclusive, are for defendant's service, hotel and travelling expenses in attending to the business, and sums paid an agent which fairly belong to the range of duties for which a remuneration is afforded in commissions allowed. *Morris* v. *Morris*, 1 Jones' Eq., 326. They were therefore properly rejected as additional claims.

*Exc.* 6. This exception is sustained. The defendant seems to have alone administered the estate, and as commissioners are to measure and compensate the services rendered, the *feme* plaintiff is not entitled to share with the defendant therein. *Grant* v. *Pride*, 1 Dev. Eq., 269.

The defendant files additional exceptions, designated by letters and not numbered, which must also be examined and disposed of.

*Exc. A.* The first exception is to the alleged vagueness of the findings of fact, and the failure of the referee to disclose the particulars which enter into and form the aggregate sum of $21,482.35. The referee declares that this sum was produced from sales of goods and collections of debts due the firm, and in the amounts specified in book 1, p. 301, *et seq.* There is

nothing indefinite in this form of the finding, and it is not intimated that the estimate is erroneous.   We deem the matter wholly immaterial.

*Exc. B.*  The defendant excepts to the finding, as solvent, and charging him with the following claims:  Two notes of C. Rhine and L. A. Mason, each for $100; a note of C. Rhine, J. C. Lewis, and E. Pasour, for $500; two notes of J. L. Withers, one for $15.95, the other for $13.58; a note for $8.78; an order of R. J. Beatty for $30; an account against Leander Smith for $136.32; a judgment recovered of L. A. Mason for $495.32; another for the sum of $71; a third judgment against same for balance of $1,971.80.

*a.* The two notes first mentioned are reduced by scaling the one to $6.66 and the other to $11.11, and these sums are charged.

*b.* The defendant admits that the $500 due by C. Rhine, E. Pasour and J. C. Lewis could be collected of Pasour, and that the notes of Withers are solvent.

*c.* The defendant, as appears by voucher 1, in exhibit "X," claimed credit for a payment to R. J. Beatty of $535.23 while he held the claims against the debtor specified in the exception. They should have been used in lessening the debt of Beatty, and when asked why this was not done, the answer is, "I do not know, I cannot explain it."   He is, therefore, clearly liable for the consequences of this neglect.

*d.* The indebtedness of Leander Smith has been already considered.

*e.* The several judgments recovered against L. A. Mason, as shown in the execution docket, on some of which payments are credited, and others from the sheriff's return, were not collected by order of the plaintiffs.

The only evidence in reference to these claims, so far as we can discover, is that furnished by an inspection of the execution docket, and from this it appears that large sums were collected, and sometimes in full.   It is manifest, from the fact that they were prosecuted to judgments, that an effort to secure payment

was made, and it is not shown that more could, by greater diligence and activity, have been obtained than was in fact collected; and the personal interest of the defendant to the extent of one-fourth would seem to have been sufficient to impel him to make efforts to secure the whole debt. It is shown that he sanctioned the failure of the sheriff to make the money in three instances, in one of which he shortly after secured a payment of nearly one-half the debt, and subsequently nearly one-fourth additional. The indulgence may have been the essential means of securing so much.

But however this may be, we do not think, in the absence of all evidence of negligence, the defendant should be charged with more than he collected, and with the sums actually paid him he is of course chargeable.

*Exc. C.* This exception is to the accuracy of the referee's computation of interest, and a revision will be necessary on a second reference.

*Exc. D.* This is similar to the last.

*Exc. E.* The interest must be calculated on the sums collected from L. A. Mason previous to June 1st, 1873, from that date in accordance with a former ruling.

*Excs. G, H, I, K, L, M, and N,* are all to alleged erroneous reckonings of interest, and require no further comment.

*Exc. O.* The defendant charges himself with the sum of seven hundred dollars, a dividend declared and distributed to the members of the firm, in his *guardian* account, while the referee has transferred it to the administration account, and the objection is to the change. The entry bears date January 1st, 1871, and interest is computed from that time. The intestate died on January 14th, 1871, and this money became due, and the entry is made, as if paid, previously and during the guardianship. But we are unable to perceive, as the charge itself is not disputed, how the defendant can be prejudiced by its being placed on the one rather than the other account. In either case the sum is the same and the interest begins at the same time.

*Exc. P.* This exception is admitted by the plaintiffs to be well founded. The $259.55 enters into and forms part of the sum with which the defendant is charged ($2,876.75), in passing upon and sustaining the first exception of the plaintiffs. The interest, of course, follows the disposition of the principal. The other item and interest must be stricken out.

*Exc. Q.* This is an alleged error of computation to be revised by a future referee.

*Exc. R.* The allowance of commissions is sustained.

*Exc. S.* The defendant excepts to the method of computing interest on the Singer debt of $900. The defendant admits his collection of the entire note and his own account shows that $540 had been paid on it on January 17th, 1870. The testimony of the *feme* plaintiff, who delivered this note to the defendant, states that it was dated in 1866, and bore interest at the rate of eight per cent., and this meets with no correction in the examination of the defendant. It must be assumed, therefore, that the security was in the form and of the kind warranting this rate; and if not, that it was recognized and with this interest paid to the defendant. If it were otherwise, it behooved him to show the fact. But that rate ceased on the sum paid January 17th, 1870, and the defendant is only liable thereon from June 1st, 1873, at the legal rate of six per cent. This item must be reformed accordingly, and so far the exception is sustained.

*Exc. T.* Overruled.

*Exc. U.* This exception, embodied in a previous one, has been sustained as to the whole charge.

*Excs. V, W, X, Y.* Except so far as already decided, are overruled.

*Exc. Z.* There is no evidence in the record, and the vouchers for these payments to these members of the firm are not copied, so that we can see from an examination of their face when the moneys so paid were received. It is reasonable to infer that the vouchers do thus show the date of the several payments, as no controversy is made as to the asserted fact. But as interest is to

be counted from June, 1873, on the sums received and expended in the settlement of the firm accounts, this difference in date becomes unimportant.

*Exc. Ya.* Upon the same ground we sustain this exception, and the interest must be calculated from the time of the successive payments on the amount of each.

*Exc. Zb.* As we have already sustained the ruling of His Honor, that no interest on the receipts and disbursements is to be charged prior to June 1st, 1873, this exception has been neutralized and has become entirely immaterial.

We have treated this action as intended in its general scope and aim, to effect a settlement of the intestate's estate in the defendant's hands, and wholly administered by him, in order to ascertain their amount and recover the distributive shares therein accruing to the *feme* plaintiff and her infant child, of whom she is the appointed guardian ; and not as one merely to enforce the specific contract entered into between the associated representatives for an account and the payment over of the trust fund by one to the other. The settlement of the administration is an execution of part of the contract, and both distributees are interested in the result. The infant distributee ought to be made a party to the suit, and must be before any final decree is rendered. This is due to the defendant for his protection against another suit at the instance of the infant distributee, protracted, expensive and harassing, and to the infant to secure his distributive share in the estate. We are not prepared to uphold the contract, in this feature, as one entitled to a specific enforcement, if its validity were now opened to question. But it would be manifestly unjust to leave the defendant exposed to a similar suit by the infant, or to deny to him the right to have judgment against the defendant for his portion of the trust estate.

The identity of interest between the distributees, and the additional relation of guardian and ward subsisting between them, furnish an assurance, if any were wanting, that the common interest of both has been faithfully guarded throughout.

We are not without fears, that, in the meagre evidence sent up which we are required to look into and determine its bearing and effect, we may have done injustice to one or both the parties in the conclusions sometimes arrived at upon its full consideration. But we must decide the case and all its points upon the transcript, and cannot go outside of its limits.

The cause must be remanded to the superior court, to the end that a reference may be there ordered, where it can be more conveniently executed, for the purpose of revision and reformation in the particulars pointed out in our rulings, and that the infant distributee be made a party in order to a final adjustment of the administration.

We do not deem this a proper case for costs, and each party will pay his own, and it is so adjudged. The costs of the printing of the record will be paid equally by the plaintiffs and the defendant.

